IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| VICKI CHAMBLISS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-cv- 4175-JPG |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS and BRENT FINLEY, | ) | |
| | **)** | |
| Defendants. | *)* | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendants the Illinois Department of Corrections ("IDOC") and Brent Finley ("Finley") (Doc. 25). Plaintiff Vicki Chambliss ("Chambliss") has responded to the motion (Doc. 29) and the defendants have replied to that response (Doc. 37). Chambliss has also filed a motion to strike certain exhibits upon which the defendants' summary judgment motion relies (Doc. 30), and the defendants have responded to that motion (Doc. 34).

In this case, Chambliss alleges that IDOC, her employer, is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, for sexual harassment, and that Finley, her supervisor, is liable under 42 U.S.C. § 1983 for sexual harassment in violation of her Fourteenth Amendment equal protection rights. The defendants contend that Chambliss cannot establish a case of sexual harassment and, if she could, they would be entitled to assert an affirmative defense and, as for Finley, he would be entitled to qualified immunity.

## I.     Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases such as employment discrimination cases that often turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.    Evidence Considered

### A.    Motion to Strike

As a preliminary matter, the Court must address to what extent, if at all, it will consider the exhibits Chambliss seeks to strike when it assesses the evidence in support of the motion for summary judgment.  In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial.  *See Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001);  *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

Chambliss asks the Court to strike three exhibits offered in support of the defendants' motion for summary judgment:

- A February 3, 2004, IDOC report by Leslie McCarty ("McCarty"), an IDOC investigator, about the investigation of a sexual harassment complaint made by Sharon Humm ("Humm"), one of Chambliss's coworkers ("Humm Report");

- An April 25, 2004, IDOC report by McCarty about the investigation of a sexual harassment complaint made by Chambliss ("Chambliss Report"); and

- A February 6, 2004, letter from Humm to McCarty ("Humm letter").

Chambliss claims that these documents are out of court statements and cannot therefore be offered for the truth of the matters asserted therein under Federal Rule of Evidence 802.

### 1.    Humm and Chambliss Reports

Chambliss does not contest that the two reports are admissible for the purposes of showing that an investigation was conducted, but believes they cannot be used to show that the statements in the reports are true.  She believes the reports do not fall into the business records exception to the hearsay rule.  *See* Fed. R. Evid. 803(6).

The defendants agree with Chambliss that they may use the reports to show that an investigation was conducted and also believe that they may use the reports to show the extent of

the investigation, what information IDOC had been given, and whether its response was reasonable based on that information. *See* Fed. R. Evid. 803(3). It also believes Chambliss's statements as recorded in the Report would be admissible as admissions of a party-opponent, *see* Fed. R. Evid. 801(d)(2), and that the entire reports are admissible as public records or reports, *see* Fed. R. Evid. 803(8)(C), or business records, *see* Fed. R. Evid. 803(6).

The defendants are correct that the reports can be used to show the existence of their investigations as well as what information IDOC received during those investigations for the purpose of demonstrating their knowledge and explaining their beliefs and responses in light of that knowledge. When used for those purposes, the reports are not being used for the truth of the matters asserted in them but for IDOC's state of mind, regardless of whether the statements in the reports were truthful. Thus, the reports are not hearsay under Rule 801(c) and are admissible when offered for those purposes. *See Woods v. City of Chicago*, 234 F.3d 979, 986-87 (7th Cir. 2000) (criminal complaint and arrest report admissible to show whether reasonable officer in arresting officers' position would have had probable cause to believe crime had been committed).

The Court further finds that the reports are not admissible for the truth of their substance under Rule 803(8)(C) as public records or reports. Rule 803(8) is an exception to the hearsay rule for

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Although the reports at issue here may technically qualify as "factual findings resulting

4

from an investigation made pursuant to authority granted by law," the sources of information in the reports – the complainants' fellow IDOC employees – lack sufficient trustworthiness. The report essentially contains responses from IDOC employees who were asked to describe various aspects of their work environment. The witnesses' statements were not under oath and were full of subjective statements and opinions. Furthermore, as demonstrated by some of the statements themselves, the witnesses may have been motivated by petty gripes and jealousies about their coworkers rather than a desire to tell the truth. There was no hearing held to assess the credibility of the witnesses and to arrive at a conclusion, and the reports themselves were rendered by a representative of a party to this litigation. In the foregoing respects, the reports at issue here are distinguishable from the administrative Equal Employment Opportunity Commission ("EEOC") findings found to be admissible in *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 624 (7th Cir. 2003). For these reasons, the statements in the reports are not the kind of trustworthy data that this Court will accept as evidence absence additional safeguards such as, for example, being subject to cross-examination or being sworn to or declared under penalty of perjury.

The Court further finds that the reports are not admissible under Rule 803(6) as business records. Rule 803(6) is an exception to the hearsay rule for records of regularly conducted activities:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or

circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

This exception does not generally render reports admissible, even when kept in the regular course of business, where the supplier of the information in the report does not act in the regular course of business. *See* Fed. R. Evid. 803 advisory committee's notes on 1972 proposed rules. Furthermore, for the same reason the Court did not find the reports trustworthy as public records under Rule 803(8)(C), it finds that they are not trustworthy as business records under Rule 803(6) and will not consider this for the truth of the matters reported in them in deciding the pending summary judgment motion.

As for Chambliss's statements in the reports, the defendants are correct that if they are sought to be used against her in this case, they are not hearsay because they fall under Rule 801(d)(2)(A). However, the defendants have not overcome the first layer of hearsay, that McCarty has not testified herself as to what Chambliss said. Had McCarty testified in a deposition or affidavit as to what Chambliss said in the interviews, that evidence would be admissible. McCarty's out of court statement recounting Chambliss's alleged statements are not.

2.  Humm Letter

Chambliss asks the Court to disregard the statements in the Humm letter that Chambliss was engaging in sexually inappropriate behavior in the workplace because they are hearsay – Humm's out-of-court statements about what she heard other people say happened when she was on a leave of absence.

Again, Humm's letter does not qualify as a public record or a business record, and had Humm herself testified in a deposition or stated in an affidavit about her first-hand knowledge

about what Chambliss said or did, it might have been admissible as an admission of a party opponent. However, her letter is hearsay and will not be considered by the Court for the truth of the matters asserted in it.

For these reasons, the Court will grant the motion to strike (Doc. 30) to the extent it asks the Court not to consider the interviewees' statements in the reports or Humm's statements in her letter for the truth of the events they report.

B.    Chambliss Affidavit

In their reply brief, the defendants ask the Court to disregard portions of Chambliss's affidavit offered in opposition to the summary judgment motion on the ground that it conflicts with her deposition testimony and that she has not given a reasonable explanation for the conflict.

The law is well-established that "in general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs.*, 259 F.3d 792, 799 (7th Cir. 2001) (quoting *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999)). "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995))); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 919 n. 4 (7th Cir. 2001). This rule applies, however, only where the discrepancies are transparent shams, not where they are simply clarifications of earlier ambiguous or confusing statements where they merely go to the credibility of the witness. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75

F.3d 1162, 1169-72 (7th Cir. 1996). Furthermore, the Court will consider a contradictory affidavit if the declarant satisfactorily explains the discrepancy in the testimony. *Commercial Underwriters*, 259 F.3d at 799.

If Chambliss's affidavit contradicts her deposition testimony and there is no plausible explanation for the conflict, the Court will disregard that portion of the affidavit in ruling on the summary judgment motion. The Court will examine each alleged conflict separately and, if necessary, will note in its recitation of the facts when affidavit statements have been disregarded.

Most of the defendants' objections, however, are to additional facts presented in Chambliss's affidavit that supplement but do not conflict with her deposition testimony. To the extent that the defendants object because Chambliss adds in her affidavit details that she did not include in her deposition but that do not contradict her deposition, the Court will consider those affidavit statements. Chambliss's lack of completeness at her deposition can easily be attributed to poor or insufficient questioning; a deponent cannot be faulted for failing to answer questions that were not asked.

## III.    Facts

Taken in the light most favorable to Chambliss, the evidence establishes the following facts.

### A.    Chambliss's Employment

Chambliss, a woman, has worked for IDOC at Big Muddy Correctional Center ("Big Muddy") since October 1994. During her employment, IDOC maintained a sexual harassment policy which Chambliss concedes was part of IDOC's reasonable efforts to prevent and correct promptly sexually harassing behavior about which it knew. Under that policy, if a person feels

she is being sexually harassed, she is supposed to tell the harasser she does not want the harassment, tell the harasser to stop and inform the harasser's supervisor. If her supervisor is the harasser, she is supposed to inform the next higher person in the chain of command and fill out an incident report.

Chambliss started working in the business office as an Account Tech 1 in 1999. The business office consisted of a common room about 40 feet by 40 feet containing about 9 to 12 desks arranged in rows and two adjacent, private offices for the business administrator and the business manager. Most of the business office employees, including Chambliss and one male coworker, worked in the common area, and because of the relatively small size of the room, the heavy workload, lack of sufficient staff and the fast pace, the environment was stressful. To relieve the stress, light chatter among employees was common, and the chatter often included comments and jokes with sexual or vulgar content. Many employees also joked openly about their personal sex lives and teased other employees about theirs. Male and female employees alike participated in the vulgar and sexual chatter, although at least one female employee, Sharon Humm, was extremely uncomfortable with it.

Chambliss herself discussed personal sexual matters with female friends in the office but did not participate in the office-wide comments of a sexual nature.

B.    Finley's Arrival

In January 2003, Finley became the business administrator. Chambliss and all the other business office employees reported directly to Finley, who was responsible for conducting their evaluations and approving leave time and overtime.

To relieve office stress, Finley joined in the office chatter, often speaking using casual

sexual overtones and constantly making sexual jokes and comments when both men and women were present in the office. Finley was also the butt of jokes by business office employees, which he would tolerate with good humor. Chambliss never made any comment of a sexual nature in front of Finley. He was a large man, and Chambliss was intimidated by him.

About three months after he began to work in the business office, Finley began the conduct about which Chambliss complains in this case. At that time, he made faces and commented that Lisa Asbury ("Asbury"), who had come in the office from another department, had a "nice ass" and that he would like to "have some of that." He repeated this comment approximately 25 times between April and November 2003.

Three to five times Finley described pornographic movies to the entire office generally and one time to Chambliss when he was alone with her in his office. When he described the movie to Chambliss alone, she told him she did not want to hear about it.

On one occasion in July 2003, Chambliss had submitted a request to leave work early one day. Finley wrote a note and stuck it on Chambliss's leave request reading, "Nooner?" implying she needed time off to have sex in the middle of the day. Chambliss did not say anything to Finley about the note.

Another time in July or September 2003, Finley called Chambliss into his office after she had taken time off and asked her if she had had sex during her leave and other detailed questions about her private sex life. When she refused to answer his questions, he kept inquiring about the details of her sexual experiences on her vacation. Throughout the conversation, Chambliss said she did not want to discuss it and she ultimately left Finley's office.

Also in July 2003, after Finley and Chambliss had argued about something, Finley

hugged Chambliss tightly for five to ten seconds in his office to signify that they had made up. She did not hug him back and did not think the hug was appropriate, but she did not say anything to him about it.

In October 2003, Finley brought in a birthday cake shaped like a woman's breasts for Chambliss's and another employee's birthday.

Also in October 2003, Finley called Chambliss into his office and told her in detail about a sexual dream he had had about her best friend, Karla Klindworth ("Klindworth"), who worked in the Big Muddy warden's office. Chambliss said she did not want to hear it. Finley then asked Chambliss to tell Klindworth about the dream and to help Finley get to know Klindworth better. Again, Chambliss refused. Finley approached Chambliss another time about Klindworth, but Chambliss said she did not want to listen to him.

On another occasion in October or November 2003, Chambliss challenged Finley to lose weight and discussed with Finley and other business office employees what the office could do to reward him if he met his weight loss goal. Later, Finley called Chambliss into his office and asked her to go out for drinks with him as a reward for his weight loss. She refused and returned to her desk. This was the only time Chambliss believed Finley was making any attempt to become romantically involved with her.[1]

In addition to these specific instances, Finley also made numerous comments of a sexual nature. For example, he also said in Chambliss's presence on multiple occasions that his "memory was as short as his penis," and whenever he went to the bathroom he complained that

---

[1]To the extent that Chambliss's affidavit conflicts with her deposition testimony, the affidavit testimony has been disregarded.

he needed to lose weight so he could reach his penis. Finley also commented once that after work he liked to jump naked into his hot tub and that sex was good with his wife. When speaking to Chambliss, he also said once that in Texas you could hire women to clean your house while naked and that they were fun to watch.

C.    Humm's Sexual Harassment Complaint

In response to a sexual harassment complaint against Finley by Humm in December 2003, IDOC investigator McCarty began an internal investigation. In February 2004, she compiled the Humm Report for her IDOC superiors. It did not contain a report of complaints from Chambliss about the sexual jokes in the workplace or about Finley's behavior. Chambliss failed to report Finley's behavior to McCarty because Finley had reminded her that he could be vindictive to her by, for example, moving her desk or changing her work hours from the 7 a.m. to 3 p.m shift to the 8 a.m. to 4 p.m. shift. She was afraid Finley would treat her badly if she told the truth. McCarty ultimately concluded in the Humm Report that there had been no sexual harassment in violation of IDOC's sexual harassment policy.

Following Humm's complaint, Chambliss threatened that she would file another sexual harassment complaint against Finley if he made her mad.

D.    Office Changes

In early March 2004, Finley met with Mary Ann Bohlen ("Bohlen"), IDOC central accounting supervisor and the IDOC employee ultimately responsible for giving guidance to Big Muddy's business office. Prior to the meeting, Finley had assigned duties relating to the inmate trust fund to several employees, including Chambliss, but Bohlen recommended that Finley assign all duties relating to maintaining the inmate trust fund to one employee, Chambliss, as had

been done at Big Muddy in the past.  Bohlen also reminded Finley that employees should be expected to complete their regular job tasks during normal working hours without working overtime.

On March 5, 2004, shortly after his meeting with Bohlen, Finley assigned all trust fund duties to Chambliss, adjusted her work hours from the 7 a.m. to 3 p.m. shift to the 8 a.m. to 4 p.m. shift and stopped authorizing her overtime to complete her assigned job tasks.  Chambliss then began taking detailed notes about events in the business office;  none of her notes reflected any conduct or speech of a sexual nature.  When Finley declined to approve overtime for Chambliss on March 23, 2004, she and Finley got into an argument.

The following day, March 24, 2004, Chambliss orally complained to Big Muddy's warden, Greg Lambert, that Finley had been sexually harassing her.  Warden Lambert immediately instructed Chambliss to speak to IDOC's Affirmative Action office and set up a telephone conference the same day for her to speak with McCarty.  McCarty later interviewed Chambliss in person and told Chambliss to e-mail her if she wanted to report anything else. Chambliss did not experience any sexual harassment by Finley after she reported him to Warden Lambert.

Chambliss never submitted an incident report to the warden about Finley's offensive conduct as IDOC's sexual harassment policy provides because she thought it would be futile, she thought the warden did not like her and she thought she would have been treated like an outcast in the office.

In April 2004, McCarty submitted the Chambliss Report, which ultimately determined that Chambliss's claims of sexual harassment by Finley could not be substantiated.

On May 10, 2004, Chambliss learned that Warden Lambert did not want her to visit Klindworth in his office anymore, and she was worried that she would be referred for discipline. That same day, Chambliss began a leave of absence because of workplace stress she attributed to Finley's offensive conduct. She has been in counseling since July 2004 to work through issues regarding the treatment she received from Finley.

On September 12, 2005, Chambliss timely filed this lawsuit. The complaint makes claims of sexual harassment against IDOC in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) (Count I), sexual harassment against Finley in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment's equal protection clause (Count II), and retaliation against Finley in violation of § 1983 and the First Amendment (Count III). Chambliss concedes that Count III should be dismissed with prejudice in light of the recent decision of the Supreme Court in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006). Counts I and II are the subject of the pending summary judgment motion filed by the defendants.

IV.     **Analysis**

Title VII prohibits discrimination on the basis of sex:  "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Fourteenth Amendment's equal protection clause contains a similar prohibition. It forbids any state to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Essentially, the clause guarantees "a right to be free from invidious discrimination in statutory classifications and other governmental

14

activity," *Harris v. McRae*, 448 U.S. 297, 322 (1980), and includes the right to be free from

sexual harassment, *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006); *Bohen v.

City of E. Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986). The standard of proof for Title VII and

§ 1983 equal protection sexual harassment claims is essentially the same, *Murray v. Chicago

Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001), so although this analysis primarily speaks in

the Title VII vocabulary, most of it applies equally to Chambliss's § 1983 claim against Finley.

The sex discrimination prohibited by Title VII and the Fourteenth Amendment includes

sexual harassment that is so severe or pervasive that it alters the condition of the victim's

employment and creates an abusive working environment even where there is no tangible

employment action. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Courts generally

refer to these types of cases as "hostile environment" cases. Chambliss does not argue that she

suffered a tangible employment action in this case and has thus forfeited that position for the

purposes of this motion, so the hostile environment framework guides the Court's consideration

of Chambliss's claims.[2]

In order to establish such a hostile environment sexual harassment claim, a plaintiff must

show,

(1) she was subjected to unwelcome sexual advances, requests for sexual favors or other

---

[2]To the extent that Chambliss may be arguing that her May 2004 leave of absence amounted to a constructive discharge, that claim is simply unsupported by the record. "A constructive discharge occurs when an employee resigns his or her current position because the employee considers the conditions intolerable and a reasonable employee also would have found the conditions made remaining in the job unbearable." *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003) (citing *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). The evidence in this case shows that Chambliss suffered no sexual harassment after her complaint to Warden Lambert on March 24, 2004. Thus, no reasonable jury could find that her working conditions in May 2004 were intolerable.

verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability.

*Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).[3]

In this case, the defendants argue that (1) Finley's conduct was not unwelcome to Chambliss, (2) Finley's conduct was not based on Chambliss's sex, (3) Chambliss's working environment was not severe or pervasive enough to create an objectively hostile environment and (4) there is no basis for employer liability. In discussing the subject of employer liability, the defendants assert an affirmative defense that Chambliss did not reasonably seek to avoid the harassment. Finley individually argues that he cannot be liable under § 1983 because (1) he was not acting under color of state law and (2) he is entitled to qualified immunity.

### 1. Unwelcome Sexual Advances

A reasonable jury could find that the sexual harassment to which Finley subjected Chambliss was unwelcome.

The defendants argue that Chambliss herself instigated and encouraged sexually explicit conversations and jokes in the workplace and that such conduct indicates that the sexual talk

---

[3]Some Seventh Circuit opinions continue to add the requirement that the hostile work environment seriously effect the plaintiff's psychological well-being. *See Valentine v. City of Chicago*, 452 F.3d 670, 677 (7th Cir. 2006); *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003). These cases rely on cases that predate *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). *See Valentine*, 452 F.3d at 677 (citing *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citing *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993) (citing *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1238 (7th Cir. 1989)))); *Durkin*, 341 F.3d at 611 (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002) (citing *Parkins*, 163 F.3d at 1032 (citing *Rennie*, 3 F.3d at 1107 (citing *Swanson*, 882 F.2d at 1238)))). *Harris* held that "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive . . ., there is no need for it also to be psychologically injurious." *Harris*, 510 U.S. at 22.

Finley subjected her to was not unwelcome. It is true that where a plaintiff was a willing and welcome participant in sexual banter, jokes and teasing in the workplace, she cannot establish that such conduct was unwelcome. *See Reed v. Shepard*, 939 F.2d 484, 491 (7th Cir. 1991) (holding that plaintiff who exhibited an "enthusiastic receptiveness to sexually suggestive jokes and activities" and whose "preferred method of dealing with co-workers was with sexually explicit jokes, suggestions and offers" did not establish the conduct was unwelcome).

This case, however, is not like *Reed*. Considering the evidence in Chambliss's favor, as the Court must at this stage, the Court finds that although Chambliss may have spoken about sexual topics at work, she did so in private conversations and not as a part of the office-wide sexual banter. Furthermore, the evidence viewed in Chambliss's favor also demonstrates that Chambliss never made comments of a sexual nature in front of Finley, and frequently expressed her objections or ignored Finley when he talked about sexual topics with her. This presents a picture vastly different from that in *Reed*, where overwhelming evidence at trial painted the plaintiff as a willing creator of and participant in the sexually charged environment. Based on the facts in this case, the Court believes a reasonable jury could find that Finley's conduct toward Chambliss was unwelcome.

### 2.     Directed at Chambliss Because of Her Sex

A reasonable jury could find that the sexual harassment to which Finley subjected Chambliss was based on her sex.

The defendants argue that Chambliss was subject to sexual comments because of her personality – she was inclined to sexual talk – not her gender. Citing *Reed* again, the defendants note that where sexual comments are in response to the plaintiff's preference for resorting to

sexual jokes, suggestions and offers, they cannot be said to be because of her sex. *See Reed v. Shepard*, 939 F.2d 484, 491 (7th Cir. 1991). The defendants further note that Finley's sexual talk in the office occurred in the presence of men as well as women, so both sexes were equally harassed.

Had Finley's sexual comments to the office as a whole been the sole conduct about which Chambliss complained, the defendants' argument might have merit. However, the record contains several instances that a reasonable jury could view as targeting Chambliss because she is a woman. For example, it is reasonable to believe that Finley would not have hugged a male employee when making up from a fight or asked a male employee out on a date. The record also contains several instances that a reasonable jury could view as harassment of other women or women in general that Chambliss was exposed to second hand. For example, Finley made improper sexual comments repeatedly about Asbury and brought in a cake shaped like a woman's breasts. These instances could be viewed as harassment because of Chambliss's sex.

### 3. Hostile Environment

Chambliss has not presented enough evidence from which a reasonable jury could find that she was subject to an actionable hostile environment. A hostile work environment is created by conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986); *accord Cooke v. Stefani Mgmt. Servs.*, 250 F.3d 564, 566 (7th Cir. 2001). Sexual harassment that creates a hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor*, 477 U.S. at 67) (further internal quotations omitted); *see also Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (*per curiam*); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "Harassment need not be severe *and* pervasive to impose liability; one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

Whether an environment is objectively sufficiently hostile or abusive must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-788 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)) (further internal quotations omitted); *accord Breeden*, 532 U.S. at 270-71; *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888-89 (7th Cir. 2001). Courts "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Breeden*, 532 U.S. at 271. For example, a court has found that "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998). On the other hand, an uninvited kiss and an

19

attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim. *Hostetler*, 218 F.3d at 807-08.

In addition, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke*, 250 F.3d at 566-67 (citing *Harris*, 510 U.S. at 21-22); *accord Murray*, 252 F.3d at 889.

This is a close case, but considering all the circumstances the Court must conclude that Chambliss has not presented enough evidence from which a reasonable jury could find that she was subject to an objectively hostile work environment because of Finley's conduct. There is evidence that from the day Finley began working in the business office, he participated in chatter of a sexual nature on a daily basis to the office in general, but Chambliss does not complain of Finley's behavior when he first began working in the business office. She only complains of the conduct that began about three months after Finley started work: his 25 comments about Asbury, his describing pornographic movies once to her alone and as many as five times to the office in general, his note on her leave request, the one time he interrogated her about her sexual experiences on her vacation, his hugging her for five to ten seconds, his bringing in a birthday cake in the shape of a woman's breasts, his telling her about his dream about Klindworth, his asking her out on a date, and numerous other comments to the office in general. This conduct all occurred over an approximately one year period.

While Finley's behavior was certainly boorish, it did not create an objectively hostile work environment for Chambliss. His behavior consisted mostly of relatively innocuous and non-threatening offensive utterances, many of which were in line with the sexual banter in the

business office that existed before he began working there in January 2003.  Although Finley's comments were frequent, a good number of them were not directed at Chambliss herself.  When harassing statements are "directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff."  *McPhaul v. Madison Co. Board of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000) (internal quotations and citations omitted).  The conduct that was directed at Chambliss was neither severe nor pervasive;  there was only one instance of physical touching – a hug – and a handful of offensive comments and questions.  Chambliss only viewed one instance as a sexual advance toward her, and she was able to rebuff it simply by refusing Finley's invitation for a date and returning to her desk.  Furthermore, all of the conduct about which Chambliss complained occurred over about a year and was simply not sufficiently severe or pervasive to alter the terms and conditions of Chambliss's employment by creating an objectively abusive working environment.

### 4.   IDOC's Liability

Even if Chambliss's work environment had been objectively hostile, the Court finds that IDOC is not liable for the sexually harassing hostile environment experienced by Chambliss.

Generally, employers are vicariously liable for an actionable hostile environment created by a supervisor with authority over the victimized employee.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998);  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998);  *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).  If the harassment culminated in tangible employment action against the employee, the employer is strictly liable for the supervisor's acts.  *Faragher*, 524 U.S. at 808;  *Ellerth*, 524 U.S. at 760-61;  *Rhodes v. Illinois Dep't of Transp.*, 359

F.3d 498, 505 (7th Cir. 2004). However, if the supervisor did not take any tangible employment action against the employee, as it did not in this case, the employer may raise an affirmative defense to liability or damages. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Rhodes*, 359 F.3d at 505-06. To succeed in its affirmative defense, the employer must show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Molnar*, 229 F.3d at 600.

Chambliss does not seriously contest that IDOC has met its burden of showing that it exercised reasonable care to prevent and correct promptly sexually harassing behavior about which it knew. She takes issue, however, with IDOC's proof of the second element – that she unreasonably failed to take advantage of preventative or corrective opportunities provided to her. The requirement that an employee report sexually harassing conduct arises out of her duty to take reasonable care to avoid harm. *Faragher*, 524 U.S. at 806; *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005). "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998) (quotations omitted).

The Court finds that IDOC has met its burden of showing that Chambliss unreasonably failed to take advantage of its sexual harassment reporting mechanisms. It is undisputed that Chambliss had the opportunity to report Finley's harassing activities at any time by either speaking to the warden or filing an incident report and that during the investigation of Humm's

22

complaint, McCarty specifically gave Chambliss an opportunity to comment on Finley's behavior. Instead of telling the truth, Chambliss actively deceived McCarty as to the nature of Finley's conduct in the business office. Furthermore, it is clear that Chambliss knew about the sexual harassment reporting channels, for she threatened to use them to report Finley after the investigation of Humm's complaint if Finley made her mad. It is also undisputed that Chambliss did not report Finley's harassing activity until March 24, 2004, when she spoke to Warden Lambert, and that after her report, Finley's sexual harassment stopped. Thus, the critical question is whether Chambliss's failure to use available reporting mechanisms before March 24, 2004, was unreasonable.

IDOC argues that Chambliss's failure to use the multiple avenues of redress available to her establishes the second element of its affirmative defense. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08.

Chambliss, on the other hand, argues that she did not use the reporting channels in IDOC's sexual harassment policy or report Finley's conduct to McCarty in her investigation of Humm's complaint because she was afraid of retaliation by Finley, she thought a report would be futile, she thought the warden did not like her and she thought she would have been treated like an outcast in the office. A reasonable fear of retaliation can constitute a legitimate excuse for failing to take advantage of preventative or corrective opportunities or otherwise to avoid harm. *See Johnson v. West*, 218 F.3d 725, 732 (7th Cir. 2000). For example, in *Johnson*, the

Court of Appeals held that a probationary employee's failure to report harassment might be reasonable where the supervisor had threatened that she would lose her job if she complained, verbally abused her and threw mail in her face. *Id.* However, the thing feared must be substantial before it can render a failure to report reasonable. "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation" are not enough to render a failure to report reasonable. *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) (employee unreasonably failed to report sexual harassment where she simply "didn't feel comfortable enough with anyone at [her place of employment] to speak with them about the offensive and repulsive sexual conduct displayed towards her by [her supervisor]"); *see Hill v. American Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) (noting that "apprehension does not eliminate the requirement that the employee report harassment").

This case does not present the type of situation that might have prompted a reasonable failure to report sexual harassment. Chambliss states that she feared retaliation by Finley if she reported him, but the retaliation she feared was that he would change her shift by one hour, move her desk or be vindictive or treat her badly in some other unspecified way. She also thought her coworkers would treat her like an outcast. However, these fears, even if true, are not of such a serious nature that they would excuse a reasonable employee from carrying out her very important duty to report sexual harassment in order to avoid further harm to herself. The evidence reflects that Chambliss did not fear for her job, her personal safety or her emotional well-being, like the *Johnson* plaintiff might have. She simply did not want to work different hours or sit in a different location in the office. Furthermore, her unspecified fears that Finley would be vindictive or treat her badly, that her complaints would be futile and that the warden

did not like her are simply too vague and unsupported to carry any weight.

In the circumstances in the record, a reasonable jury would be compelled to find that Chambliss's failure to report Finley's harassment before March 24, 2004, was unreasonable. As a consequence, IDOC has established an affirmative defense to liability had Chambliss been able to prove her case.

5.    Finley's Liability

Finley offers a number of theories about why he, as an individual, should not be liable for sexual harassment under § 1983. The Court will address each theory in turn as an alternative basis for finding that the defendants are entitled to summary judgment because Chambliss cannot prove an objectively hostile work environment.

a.    Avoidable Consequences Doctrine

Finley first argues that the avoidable consequences doctrine applies to shield him from liability because Chambliss unreasonably failed to report Finley's harassment prior to March 24, 2004. The only case he cites for the application of this principle to § 1983 sexual harassment cases is *Savino v. C.P. Hall Co.*, 199 F.3d 925 (7th Cir. 1999), a case which does not contain a § 1983 claim. The Court therefore finds that Finley has failed to carry his burden of establishing that he is entitled to judgment as a matter of law because of this doctrine.

b.    Color of State Law

Finley also denies that he was acting under color of state law when he harassed Chambliss because he was pursuing his own personal objectives. In order to prevail on a § 1983 claim, a plaintiff must prove, among other things, that the defendant was acting under color of state law. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "Action is taken under color of state

law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) (internal quotations omitted). "[A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office." *Id.* at 485.

Finley's claims that he was not acting under color of state law are disingenuous. During each instance of his offensive conduct, he was at work, acting as the business office administrator, exercising his discretion to manage the business office and cloaked in the authority given him by IDOC, an arm of the State of Illinois. Each act was related to the performance of his duties as business administrator and was facilitated by his professional status as a supervisor. That Finley did not expressly invoke his authority as supervisor to impose his harassment on Chambliss does not mean he was not acting with the authority and backing of the state Thus, no reasonable jury could find that he was not acting under color of state law.

c.     Qualified Immunity

Finally, Finley argues that he is entitled to qualified immunity from liability for Chambliss's sexual harassment charges. Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *accord Saucier v. Katz*, 533 U.S.

194, 206 (2001).  It applies only to state officials who occupy positions with discretionary or policymaking authority and who are acting in their official capacities.  *Harlow*, 457 U.S. at 816; *Denius*, 209 F.3d at 950.

A court required to rule upon the qualified immunity issue must first consider whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.  *Saucier*, 533 U.S. at 201;  *see Brosseau*, 543 U.S. at 197;  *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  If it is clear that there has been no constitutional violation, there is no need for further inquiry;  the officer is entitled to qualified immunity.  *Saucier*, 533 U.S. at 201.  In the interest of promoting clarity in legal standards, the Court should decide the first question even if the officer is clearly immune.  *Wilson*, 526 U.S. at 609; *Denius*, 209 F.3d at 950.

If the evidence demonstrates that there may have been a constitutional violation, then the court should determine whether the right allegedly violated was clearly established at the relevant time.  *Saucier*, 533 U.S. at 202.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at 201; *see McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202.  The plaintiff bears the burden of demonstrating that a constitutional right is clearly established.  *Denius*, 209 F.3d at 950.

The Court has already decided that Chambliss cannot established a constitutional violation because she cannot prove that she was exposed to an objectively hostile work environment.  Thus, she cannot overcome the first prong of the qualified immunity test.

To the extent that this finding was a close call, Finley is further protected, for he is entitled to qualified immunity if it was not clear to a reasonable official that his conduct would violate the equal protection clause. It is true that it was clearly established in 2003 and 2004 that, as a general proposition, sexual harassment severe or pervasive enough to create an objectively hostile environment violates the equal protection clause. *See Bohen v. City of E. Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986). It was not clear, however, that the things Finley did amounted to an objectively hostile environment. Sexual harassment cases involve unique fact patterns, and while some of those fact patterns involve sexual harassment that is so extremely severe or so extremely pervasive that a reasonable official should know that such conduct is definitely over the line, most cases fall into a gray area. It is hard to determine equivalent levels of harassment in caselaw to guide one's conduct. Are twenty comments, one touch and six leers better or worse than ten comments, two touches and no leers? As long as conduct falls into a gray area, the unlawfulness of an official's conduct is not clearly established. Thus, had the Court not found that Chambliss's work environment was not objectively hostile, it would have found that it was not clearly established at the time that Finley's conduct was unlawful.

For these reasons, the Court finds that Finley is entitled to qualified immunity and to summary judgment on that basis.

**V.      Conclusion**

For the foregoing reasons, the Court

- **DISMISSES** Count III **with prejudice**;

- **GRANTS** Chambliss's motion to strike (Doc. 30) to the extent it asks the Court not to consider the interviewees' statements in the Humm Report and the Chambliss Report and

Humm's statements in her letter for the truth of the events they report;

•  **GRANTS** the defendants' motion for summary judgment (Doc. 25) on Counts I and II; and

•  **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**Dated:  February 15, 2007**

s/ J. Phil Gilbert
**J. Phil Gilbert**
**U.S. District Judge**